**FOLEY ex rel. SCHENCK v. WARD, Commissioner of Immigration.**

**No. 5250.**

District Court, D. Massachusetts.

Feb. 25, 1936.

John T. Lane, of Boston, Mass., for petitioner.

Francis J. W. Ford, U. S. Atty., of Boston, Mass., for Mary H. Ward, Commissioner of Immigration.

SWEENEY, District Judge.

This is a petition for a writ of habeas corpus praying for the petitioner's discharge from the custody of the immigration officials on the grounds that their decision and order to deport the petitioner is "manifestly unfair," is "arbitrary and unreasonable," and that it is an "error in law."

Deportation proceedings were brought under 8 U.S.C.A. § 155, and 8 U.S.C.A. § 136 (a) and (d).

Section 136 provides for the classes of aliens who shall be excluded from the United States, and refers principally to a condition existing at the time of entry. Section 155 provides for the deportation of persons who have already entered the United States and who within five years after entry "become a public charge from causes not affirmatively shown to have arisen subsequent to landing," and other causes.

First considering section 136 (a), which provides that the following classes of aliens shall be excluded from admission into the United States: "All idiots, imbeciles, feeble-minded persons, epileptics, insane persons; persons who have had one or more attacks of insanity at any time previously; persons of constitutional psychopathic inferiority; persons with chronic alcoholism."

It has not been shown that at the time of this petitioner's entry into the United States she was within any of the above classes. Nor, from her conduct after entry, and by that I refer to the fact that she twice became pregnant, has it been shown from the medical standpoint that she was within any of the above classes.

Section 136 (d) states that the following classes of aliens shall be excluded from admission into the United States: "Persons not comprehended within any of the classes enumerated in paragraphs a, b, or c, who are found to be and are certified by the examining surgeon as being mentally or physically defective, such physical defect being of a nature which may effect the ability of such alien to earn a living."

It is to be noted that this paragraph refers to persons who are found "by the examining surgeon" to be mentally defective, etc. This petitioner was passed by the examining surgeon, and no question was raised by him at the time of her admission. If the government seeks to invoke section 136 (d) as a basis for the deportation of

this petitioner, it would appear necessary to obtain the certification of the examining surgeon. Possibly the submission of her history after entry into the United States might have caused him to make such a certification on the theory that such certification at this late date would be ample. The government, however, did not submit the matter for his examination and certification, and the decision to deport, if based on this section, was certainly arbitrary and without due process of law. This petitioner was admitted at the time of her entry as a normal person. She apparently was not considered one likely to become a public charge, as no finding to this effect was made. There is no evidence of her becoming a public charge, except for the occasion when she went to Tewksbury. This, she says, she was forced to do. While the evidence on this point is not clear, it is clear that her sister offered to take her from the home at Tewksbury and care for her. Permission was not granted to do this. Further evidence of her ability to be self-supporting is the fact that the petitioner did, on her escape from Tewksbury in 1930, continue to support herself up to the time of her apprehension in 1934. All of this negatives the possibility of a finding at the time of her entry that she was one likely to become a public charge.

On the question of her deportation under section 155 because of her having become a public charge within five years after her entry from causes not affirmatively shown to have arisen subsequent to landing, it is clear that the causes of her becoming a public charge, if she were such while confined at Tewksbury, were affirmatively shown to have arisen after her entry.

The examination on April 30, 1930, by Dr. O. J. Raeder, chief of outpatient department, Boston Psychopathic Hospital, gave the diagnosis of "very inferior intelligence." Subsequent examinations, and as late as April 18, 1934, show diagnoses of "mentally deficient and mentally defective," and "mentally deficient." These examinations were made from five to nine years after her entry, and were unaccompanied by any finding such as is required under section 136 (a).

In my opinion, the immigration officials have exceeded the authority vested in them by law, and the petitioner is ordered to be discharged from custody.